[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 18, 2003
THOMAS K. KAHN
CLERK

_____

No. 01-11553

_____

D. C. Docket No. 97-00054-CR-UUB

UNITED STATES OF AMERICA,

Plaintiff-Appellee-
Cross-Appellant,

versus

JUAN ALMEIDA,

Defendant-Appellant-
Cross-Appellee.

_____

No. 01-13235

_____

No. 97-00054-CR-UUB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN ALMEIDA,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(August 18, 2003)**

Before TJOFLAT and BARKETT, Circuit Judges, and WEINER[*], District Judge.

TJOFLAT, Circuit Judge:

I.

On March 10, 1998, a federal grand jury sitting in the Southern District of Florida issued a thirty-count superseding indictment alleging that the defendant in this case, Juan Almeida, committed several crimes when he made arrangements to distribute large quantities of cocaine to New York and Russia. Almeida was charged in nine of the thirty counts,[1] and he was ultimately convicted on count two (cocaine conspiracy). The jury returned verdicts of not guilty on the remaining

_____

[*]Honorable Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[1]Almeida was charged with the following: conspiring to engage in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (count one); conspiring to possess with intent to distribute large quantities of cocaine in violation of 21 U.S.C. § 846 (count two); unlawful use of a telephone to facilitate the drug conspiracy in violation of 21 U.S.C. § 843(b) (counts sixteen and nineteen); and interstate and foreign travel with the intent to facilitate the drug conspiracy in violation of 18 U.S.C. § 1952 (counts twenty, twenty-one, twenty-two, twenty-three, twenty-four, and twenty-five).

2

counts, save for those which the Government dismissed prior to trial.[2]

The conspiracy to distribute cocaine allegedly encompassed three ventures that were undertaken between 1986 and 1995. The first venture, the Government contends, took place in the late 1980's when Almeida, along with fugitive co-conspirator Nelson "Tony" Yester, coordinated the transportation of several shipments of cocaine from Miami to New York.[3] The second venture entailed a grandiose scheme to acquire a World War II–era Russian submarine for a Colombian drug cartel. The third venture involved a plan to conceal cocaine inside Russia-bound shipments of shrimp. The Government's "star" witness with respect to the submarine and shrimp ventures was one Ludwig "Tarzan" Fainberg, a Russian-speaking immigrant who was charged in the conspiracy and ultimately plead guilty pursuant to a plea agreement.

Almeida and Fainberg each hired their own defense attorneys. They believed, however, that some coordination might be useful in defeating the Government's case – particularly since many of the Government's exhibits were

---

[2]The Government dismissed counts one and twenty.

[3]The Government's proof as to this phase of the conspiracy was presented primarily through the testimony of Alexis de la Nuez and Ricardo Olmedo, both of whom were supposedly involved in the cocaine deliveries. These alleged cocaine traffickers will appear again in this opinion, because Almeida claims that an erroneous evidentiary ruling by the district court precluded him from exposing a de la Nuez-Olmedo conspiracy to fabricate testimony in an effort to curry favor with the Government and thereby get a reduction in their prison sentences.

recordings of Russian conversations and Fainberg was fluent in the language.[4]  The

co-defendants therefore entered into an oral joint defense agreement.  According to

Almeida's counsel, "countless volumes of attorney-client and work product

information [were] . . . shared between the parties" and "dozens of meetings

(totaling well over 100 hours) were held."

On February 19, 1999, approximately one month before trial, Fainberg

decided to defect from the united front.  In return for his testimony against

Almeida, the Government allowed Fainberg to plead to a single count of

racketeering.[5]  In the Government's view, this change of heart required the district

court to address two key issues – namely, the alleged existence of an attorney-

client privilege and a possible conflict of interest.

During the Government's case in chief, the prosecutor informed the court in

_____

[4]Almeida had the most to gain from any coordination due to Fainberg's ability to speak
the Russian language, although Fainberg presumably received some benefits, such as the ability
to coordinate a consistent story with his co-defendant.

[5]In addition to seeking dismissal of counts two through thirty of the indictment, the plea
agreement also contained the following promise:

> If in the sole and unreviewable judgment of this Office the defendant's
> cooperation is of such quality and significance to the investigation or prosecution
> of other criminal matters as to warrant the Court's downward departure from a
> sentence required by the Sentencing Guidelines, this Office may: 1) at or before
> sentencing make a motion . . . recommending that the Court sentence the
> defendant within a guideline range of Level 28; 2) recommend to the appropriate
> federal agencies that the defendant be considered for an S visa, if he meets their
> other criteria; and, 3) recommend to the appropriate federal agencies that the
> defendant and members of his immediate family residing in the United States be
> considered for admission into the Witness Security Program, if appropriate.

4

the absence of the jury that Fainberg would be her next witness and that she expected him to assert his "attorney-client privilege" with Almeida's counsel. The following court-counsel colloquy ensued. The prosecutor said that when Fainberg spoke to Almeida's counsel in connection with the joint defense, "it was just as if [Fainberg] was talking to his own attorney" and "[t]herefore, the attorney client privilege would exist." This, according to the prosecutor, showed that Almeida's counsel was impaired because of a conflict of interest. How could Almeida's attorney effectively cross-examine Fainberg when Almeida's attorney essentially represented Almeida *and* Fainberg? Almeida's counsel, the prosecutor asserted, suffered from a classic "divided loyalty" problem. The prosecutor therefore urged the district court to (1) prohibit Almeida's lawyers from using any confidential information they had obtained from Fainberg during the two years in which the joint defense privilege was in operation and (2) conduct a Rule 44(c)[6] hearing so that the court could either obtain a conflicts waiver from Almeida or else require the withdrawal of Almeida's counsel for purposes of cross-examining Fainberg.

The court apparently thought that Almeida's attorney was not laboring under

---

[6]"The court must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel." Fed. R. Crim. P. 44(c)(2).

a conflict of interest; it was concerned, however, about the possibility that in cross-examining Fainberg, the attorney might elicit or make use of privileged information. The court therefore decided to hear from Fainberg.[7] Fainberg took the stand and Almeida's attorney asked that Fainberg summarize the information that he conveyed to Almeida's defense team. The prosecutor, assuming the right to act as Fainberg's attorney, objected on the grounds that such communications could not be repeated, lest a revelation of the confidential communications in open court amount to a waiver. Although Fainberg acknowledged that the information would be useful both in cross-examining him and other witnesses and in locating defense witnesses, the court sustained the prosecutor's objection.

Referring to the prosecutor's privilege claim, the court found that a joint defense agreement existed and concluded that this agreement precluded Almeida's counsel from using any information obtained from Fainberg in connection with the joint defense. The court not only barred counsel's use of Fainberg's communications during cross-examination,[8] but also the derivative use of the

---

[7]The district court received testimony from Fainberg when it conducted a hearing to ascertain (a) the existence of a joint defense agreement and (b) the extent to which the parties to the agreement believed that communications would remain confidential.

[8]Suppose, for example, that Fainberg made proclamations of Almeida's innocence during the joint defense strategy sessions. Such hypothetical statements would have been inconsistent with the position Fainberg maintained while on the witness stand and might have revealed the existence of bias stemming from the Government's offer to advocate a reduction in Fainberg's sentence. To be sure, evidence of a plea agreement might, standing alone, tend to show bias. But

communications.[9] Defense counsel's response to the court's ruling was that the court would be committing error if it severely limited their ability to cross-examine Fainberg. Four days later, the court issued a written order (hereinafter "Order") that essentially reiterated its ruling from the bench, asserting that "[i]t is a matter of ethics" and that "[i]n the absence of Fainberg's attorney, the government, as a party with an interest, may make objections or arguments to the end of protecting the privilege."[10] Faced with the court's ruling, Almeida's counsel advised the court that they had "every intention of following the court's order" and would "tend to ask questions that are not within any area that could be privileged." The court did not, however, require the substitution of new counsel as the Government urged. Indeed, the court never undertook a Rule 44(c) hearing to ascertain the existence of a conflict of interest.

What testimony would have been presented but for the Order? Ordinarily, such a sweeping order would have prevented any sort of proffer, and a reviewing

---

the existence of a plea agreement *in conjunction with an inconsistent story* would be much more effective in establishing bias. The defense might also have been able to point out inconsistencies between Fainberg's analyses of the tape recordings made during joint defense strategy sessions (e.g., identification of certain speakers) and those made during trial.

[9]For example, the district court prohibited the use of confidential communications for the purpose of "identifying and locating defense witnesses." The court further prohibited the use of information provided by Fainberg for the purpose of "identifying voices [and] interpreting conversations heard in the intercepted communications."

[10]The Government ordinarily lacks standing to assert the attorney-client privilege for a witness. See United States v. Ortega, 150 F.3d 937, 942 (8th Cir. 1998).

court could only speculate as to what might have been revealed to the jury. In this case, however, the post-verdict stage of the litigation provides tremendous insight into the likely effect of the court's ruling. After the jury found him guilty of count two of the indictment, Almeida moved the court for a new trial. Armed with Fainberg's signed waiver of any privileges, he asked the court to lift the restrictions contained in the Order. The court, citing Fainberg's waiver, lifted the restrictions. The court also indicated that its trial ruling had been mistaken and that once Fainberg defected to the prosecutorial camp, he had no privilege with respect to Almeida's counsel.

Our first glimpse into what would have been revealed but for the court's exclusionary ruling comes in the form of Fainberg's recantation. Had Almeida's counsel been able to reveal the statements made by Fainberg during the joint defense strategy sessions, Fainberg's statements might have been similar to the story he told after the jury rendered its verdict. In a post-trial deposition, Fainberg denied conspiring with Almeida to buy or sell submarines. He claimed that Almeida was "not guilty" of the charges and that the Government concocted a case based upon Fainberg's "macho talk" that "nobody believed." Fainberg recalled that he related this position to one of Almeida's lawyers during a joint defense strategy session, but that he had to change his testimony in order to get himself

8

"out of the situation."

We also have a glimpse at what sort of evidence was missing from the jury room due to the "derivative" component of the Order. Fainberg once advised an investigator[11] that one Armando Fernandez[12] had information about Ricardo Olmedo and Alexis de la Nuez – the two witnesses instrumental to the Government's case concerning the alleged New York distribution conspiracy. After the ban on Almeida's counsel was lifted, Almeida's team visited Fernandez, who claimed that he had seen Olmedo and de la Nuez colluding to present false testimony about Almeida in order to obtain sentence reductions.[13] Defense counsel further proffered the corroborating testimony of as many as fifteen other inmates who allegedly saw Olmedo and de la Nuez "openly talking about Juan Almeida, and getting the[ir] stories straight" and later "bragging to them about how they lied against Mr. Almeida."[14] But for the district court's exclusionary ruling, the

---

[11]The investigator, retired FBI Agent Robert Whiting, was retained by the joint defense team. Fainberg's communications to Whiting about Fernandez could not be utilized by Almeida's counsel because of the Order.

[12]In the fall of 1998 or early 1999, Armando Fernandez was incarcerated in Miami, along with Fainberg, Omedo, and de la Nuez.

[13]Fernandez also claimed that he revealed the potential perjury of Olmedo and de la Nuez to the prosecutor and that the prosecutor suggested that he keep quiet.

[14]Defense counsel also proffered testimony of various businessmen who had received telephone calls from Olmedo and de la Nuez just before they testified at trial in order to get background information about Almeida.

defense might have elicited testimony about possible collusion between Olmedo and de la Nuez to commit perjury – either from Fernandez[15] or the fifteen other witnesses.

## II.

Reviewing the district court's evidentiary rulings for abuse of discretion, see United States v. Marshall, 173 F.3d 1312, 1314 n.3 (11th Cir. 1999) (citation omitted), we hold that the court abused its discretion when it precluded Almeida from utilizing the communications that Fainberg made to Almeida's attorneys while operating under the joint defense agreement. We believe that Fainberg waived the privilege when he agreed to plead guilty and testify against Almeida in exchange for the Government's dismissal of several counts in the indictment. The district court was correct when it conceded in its order denying a new trial that its exclusionary ruling was erroneous, although the court incorrectly concluded that its error was harmless.[16]

---

[15]It is not entirely clear whether Fernandez would have testified. According to Fernandez's attorney, the prosecutor warned him that "if Mr. Fernandez would testify as a defense witness to impeach the government witness, he would be committing perjury, and an investigation would ensue as to whether he perjured himself if he testified as a defense witness." It is not surprising, then, that Fernandez's lawyer advised his client to assert his Fifth Amendment privilege rather than testify in a post-verdict hearing. Even so, Almeida's attorneys claim that Fernandez agreed to testify. Moreover, the Government would be guilty of misconduct if this threat were actually made. See United States v. Schlei, 122 F.3d 944, 991-93 (11th Cir. 1997); United States v. Heller, 830 F.2d 150, 152-54 (11th Cir. 1987).

[16]The district court ultimately held that its error was harmless in light of the "withering" cross-examination of Fainberg.

## A.

Like the Government's contention at trial, Almeida's principal argument on appeal focuses upon the conflict of interest that allegedly interfered with the ability of Almeida's counsel to effectively represent their client. It is true that the Sixth Amendment right to have the effective assistance of counsel encompasses the right to have counsel untainted by conflicts of interest. See Holloway v. Arkansas, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); Cuyler v. Sullivan, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). But the case law does not address the much more tenuous claim of ineffective representation that arises in the joint defense agreement scenario. In the prototypical case, an attorney initially represents two defendants and is forced to cross-examine one of them in the same proceeding or a successive proceeding. In such a case, the attorney owes each client a duty of loyalty. The attorney faces an impossible choice: he can either vigorously cross-examine the client-turned-witness and thereby violate his duty of loyalty to the client on the witness stand, or he can temper his cross-examination and risk violating his duty of loyalty to the client on trial.[17]

When co-defendants enter into a joint defense agreement, by contrast, each

---

[17]The duty of loyalty sometimes continues even after the attorney-client relationship ceases to exist, and so conflicts of interest can still arise even if the attorney represents only one party.

11

defendant retains his own attorney. As we discuss below, confidential communications made during joint defense strategy sessions are privileged. See Wilson A. Abraham Const. Co. v. Armco Steel Corp., 559 F.2d 250, 253 (5th Cir. 1997); United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989). A duty of loyalty, however, does not exist in this situation and it is therefore improper to conclude that all of the attorneys in the joint defense strategy session represent all of the participating defendants. Any potential conflict of interest arises solely from the fact that when defendant B becomes a witness for the state, the attorney for defendant A must make sure that the attorney-client privilege is respected and that confidential communications are not revealed. The mere inability to utilize the privileged communications is not itself a manifestation of a conflict of interest, because no lawyer in the world could utilize those communications.[18] Rather, the potential conflict of interest stems from the fact that defendant A's lawyer might be so tongue-tied (due to his fear of revealing the confidential communications made by defendant B) that his representation of defendant A suffers.[19] Since the degree

---

[18]Almeida seems to miss this pont. He argues that his attorneys' inability to reveal and utilize Fainberg's communications were the "actual effects" of a conflict of interest. This is incorrect; if the communications were privileged (a point that we reject, *infra*), then *no* attorney could reveal Fainberg's communications.

[19]Unlike the present case, the attorneys in United States v. Henke, 222 F.3d 633, 638 (9th Cir. 2000), "told the district court that this was not a situation where they could avoid reliance on the privileged information and still fully uphold their ethical duty to represent their clients."

12

to which defendant *A*'s lawyer is impaired may be de minimis, the rules announced by Cuyler and Holloway might be inapplicable (or subject to modification) in this scenario. We need not decide the issue, however, because we hold that Fainberg waived his attorney-client privilege when he turned state's evidence, thereby entirely removing the possibility of a conflict of interest from the case.

B.

The attorney-client privilege is intended to encourage "full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S. Ct. 677, 682, 66 L. Ed. 2d 584 (1981). More broadly, the privilege is grounded "in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." Hunt v. Blackburn, 128 U.S. 464, 470, 9 S. Ct. 125, 127, 32 L. Ed. 488 (1888).

When a defendant conveys information to the lawyer of his co-defendant, as opposed to his own lawyer, the justification for protecting the confidentiality of the information is weak. The policy of fostering frank communication with an

13

attorney is already facilitated by privileging those communications made to the defendant's own attorney; little can be gained by extending the privilege those communications made to attorneys that do not represent the defendant. On the other hand, in light of the vast resources of the government, it is perhaps appropriate that co-defendants be given the opportunity to collaborate on defense tactics and exchange information in a confidential fashion without forcing the defendants to hire the same attorney – a situation that is almost always ripe with *real* conflicts of interest. Therefore, many courts have held that the attorney-client privilege gives rise to a concomitant "joint defense privilege" which "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." Schwimmer, 892 F.2d at 243. As the Second Circuit observed, "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter." Id. at 243-44 (citation and quotation marks omitted).

The attorney-client privilege is riddled with many exceptions, two of which are most relevant to this case. Many jurisdictions, including the former Fifth Circuit, have held that where "the same attorney acts for two or more parties

14

having a common interest, neither party may exercise the privilege in a subsequent controversy with the other." Garner v. Wolfinbarger, 430 F.2d 1093, 1103 (5th Cir. 1970). A leading treatise further explains that "[w]hen two or more persons . . . jointly consult an attorney . . and [subsequently] become engaged in a controversy in which the communications at their joint consultation with the lawyer may be vitally material," then it "is clear that the privilege is inapplicable." John W. Strong et al., McCormick on Evidence § 91 (5th ed. 1999). The treatise asserts that there are two rationales for the rule:

> In the first place the policy of encouraging disclosure by holding out the promise of protection seems inapposite, since as between themselves neither would know whether he would be more helped or handicapped, if in any dispute between them, both could invoke the shield of secrecy. And secondly it is said that they had obviously no intention of keeping these secretes from each other, and hence as between themselves it was not intended to be confidential.

Id.

It is also an ancient rule in many jurisdictions that "where an accomplice turns state's evidence and attempts to convict others by testimony which also convicts himself, he thereby waives the privilege against disclosing communications between himself and counsel." See W.R. Habeeb, Annotation, Party's Waiver of Privilege as to Communications with Counsel by Taking Stand and Testifying, 51 A.L.R.2d 521 § 4 (1957). In the nearly 150-year-old case of

15

<u>Alderman v. People</u>, 4 Mich. 414 (Mich. 1857) (internal citations omitted), for example, the court said as follows:

> But there is a broader ground upon which the admission of the excluded evidence may be based, and that is, the witness . . . was an accomplice in the crime for which the defendants, his associates, were on trial.  He had been led to give evidence for the people under an express or implied promise of pardon, or that he should not be prosecuted, on condition that he should make a full and fair confession of the truth.  It is a rule of law, that no witness shall be required to answer any question that may tend to criminate himself, yet the accomplice, when he enters the witness box with a view of escaping punishment himself, by a betrayal of his co-workers in crime, yields up and leaves that privilege behind him.  He contracts to make a full statement, to keep back nothing, although in doing so he may but confirm his own guilt and infamy.  If he fails to do so in full, if he knowingly keeps back any portion of the history of the crime he undertakes to narrate, he forfeits his right to pardon, and may be proceeded against and convicted upon his own confession, already made.  We think an accomplice who makes himself a witness for the people should be required to give a full and complete statement of all that he and his associates have done or said, relative to the crime charged, no matter when or where done, or to whom said.  He should be allowed no privileged communications.  These he has voluntarily surrendered.  The enforcement of such a rule may be the only protection the party on trial has left – the only means remaining to him to meet, it may be, the perjury of the criminal upon the witness stand.

Similarly, in the venerable case of <u>Jones v. State</u>, 3 So. 379, 380 (1888) (internal citations omitted), the court described the waiver that occurs when an accomplice testifies on behalf of the state:

> While the privilege may be waived by the client, it is generally held

16

that he does not do so merely by becoming a witness and testifying in his own behalf. But when one jointly indicted with others turns state's evidence, and attempts to convict others by testimony which also convicts himself, the rule must be different, and he has no right to claim any privilege concerning any of the facts pertinent to the issue, nor any exemption from the broadest latitude of cross-examination. He thereby waives all privilege against criminating himself, and against disclosing communications between himself and his counsel touching the offense charged. Both client and counsel may, in such case, be compelled to disclose such communications.

Both exceptions to the attorney-client privilege are open to criticism. By finding implied waivers, courts risk eroding the public's confidence that their communications will remain confidential so long as communicated to a lawyer. See, e.g., Sutton v. State, 16 Tex. App. 490 (1884) (criticizing the accomplice-turned-state's-evidence exception because it erodes the privilege). For this reason, we do not hold that accomplices always waive the privilege when they testify on behalf of the government; nor do we hold that persons represented by the same attorney always waive the privilege in the event that one of them becomes a government witness against the other.[20] In the joint defense agreement context, however, the policy rationales behind the two exceptions outweigh the minimal benefit of the attorney-client privilege. As one court recently explained:

> Although a limitation on confidentiality between a defendant
> and his own attorney would pose a severe threat to the true attorney-

---

[20]We do not foreclose such holdings in a future case. The facts of this case, however, do not require us to establish such a sweeping rule.

17

client relationship, making each defendant somewhat more guarded about the disclosures he makes to the joint defense effort does not significantly intrude on the function of joint defense agreements. . . .

. . . .Co-defendants may eliminate inconsistent defenses without the same degree of disclosure that would be required for an attorney to adequately represent her client. The legitimate value of joint defense agreements will not be significantly diminished by including a limited waiver of confidentiality by testifying defendants for purposes of cross-examination only.

United States v. Stepney, 246 F. Supp. 2d 1069, 1086 (N. D. Cal. 2003).

III.

We hold that when each party to a joint defense agreement is represented by his own attorney, and when communications by one co-defendant are made to the attorneys of other co-defendants, such communications do not get the benefit of the attorney-client privilege in the event that the co-defendant decides to testify on behalf of the government in exchange for a reduced sentence.[21] The district court's error prevented the introduction of crucial evidence that would have significantly undermined the credibility of three of the Government's key witnesses. There is a reasonable possibility that the jury would not have convicted Almeida but for the

---

[21]In the future, defense lawyers should insist that their clients enter into written joint defense agreements that contain a clear statement of the waiver rule enunciated in this case, thereby allowing each defendant the opportunity to fully understand his rights prior to entering into the agreement. See, e.g., Stepney, 246 F. Supp. 2d at 1084-86 (requiring that a written joint defense agreement include a provision that the attorney-client privilege is waived in the event that a co-defendant takes the stand against his accomplice, and citing the model joint defense agreement prepared by the American Law Institute and American Bar Association).

district court's erroneous exclusionary ruling.  The error was not harmless, and

Almeida's conviction is therefore VACATED and the case is REMANDED for a

new trial.[22]


      SO ORDERED.

---

[22]We find it unnecessary to address the parties' other alleged points of error.