UNITED STATES of America, Plaintiff,

v.

Jamarlo K. GUMBAYTAY, et al., Defendants.

Civil Action No. 2:08cv573–MEF.

United States District Court, M.D. Alabama, Northern Division.

Jan. 19, 2011.

See also 757 F.Supp.2d 1142.

Amber R. Standridge, Housing & Civil Enforcement Section, Michael Stuart Maurer, Roger Thomas Severino, Steven H. Rosenbaum, Chief, Housing and Civil Enforcement Section, Sean R. Keveney, U.S. Department of Justice, Washington, DC, James Joseph Dubois, U.S. Attorney's Office, Montgomery, AL, for Plaintiff.

Matthew Bahr, Orlando, FL, pro se.

Brett Rosenbaum, Orlando, FL, pro se.

Sean McDonough, Orlando, FL, pro se.

Bruce E. Dunn, South Daytona, FL, pro se.

### ORDER

SUSAN RUSS WALKER, United States Chief Magistrate Judge.

This case is before the court for resolution of two discovery disputes. The first of these relates to defendants Franklin, Gumbaytay, Jorgensen and Williams' motion for determination as to privilege (Doc. # 220); defendants Franklin, Gumbaytay, Jorgensen and Williams' motion to amend their motion for determination as to privilege (Doc. # 222); defendants Franklin, Gumbaytay, Jorgensen and Williams' supplement to their motion for determination as to privilege (Doc. # 225); plaintiff's response and cross-motion for protective order (Doc. # 226); and plaintiff's motion to seal (Doc. # 227). The court held a hearing on these motions on November 10, 2010.

Defendants seek a determination from this court as to whether the United States may assert what is sometimes referred to as the common interest doctrine to prevent inquiry—during depositions and other discovery—into its communications with the "aggrieved persons"[1] on whose behalf it has brought suit. Specifically, defendants desire to discover what the aggrieved persons were told when they were contacted by the United States during its "victim location" process, during which the government identified a number of female tenants or prospective tenants who allegedly were victims of sexual harassment by defendant Gumbaytay, a former property manager for certain rental housing properties in Montgomery, Alabama. The United States contends that such communications may not be discovered.

 In the instant case, "[f]ederal privilege law governs the application of the attorney-client privilege because the court has federal question jurisdiction over the subject matter." *Hope For Families & Community Service, Inc. v. Warren*, 2009 WL 1066525, 4 (M.D.Ala.2009). " 'The attorney-client privilege exists to protect confidential communications between client and lawyer made for the purpose of securing legal advice.' " *Id.* (citations omitted). "The privilege encourages 'full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and the administration of justice.' " *Id.* (citation omitted).

 The common interest doctrine is most often characterized as an exception to waiver of the attorney-client privilege rather than a privilege itself. *See, e.g., id.* at 7 (" 'Although occasionally termed a privilege itself, the

---

1. An "aggrieved person" is anyone who claims to have been injured by a discriminatory housing practice or who believes he will be injured by a discriminatory housing practice that is about to occur. 42 U.S.C. § 3602(i).

common interest doctrine is really an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person.' ") (citing *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir.2007)). This formulation of the doctrine holds that " 'the common interest doctrine only will apply where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise.' " *Id.* at 8 (citing *Seidman*, 492 F.3d 806 at 815–16). As the Eleventh Circuit has noted, " '[t]he need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter.' " *United States v. Almeida*, 341 F.3d 1318, 1324 (11th Cir.2003).

■ In the instant case, the aggrieved persons on whose behalf the government sues clearly have an interest in common with the United States. Under the Fair Housing Act, once an aggrieved person files a complaint of housing discrimination with the U.S. Department of Housing and Urban Development (HUD) and a formal charge is issued, the "aggrieved person on whose behalf the complaint was filed, may elect to have the claims asserted in that charge decided in a civil action" in federal district court. 42 U.S.C. § 3612(a). If such an election is made, "the Attorney General shall commence and maintain, a civil action *on behalf of* the aggrieved person in a United States district court seeking relief," 42 U.S.C. § 3612(*o* ) (emphasis added), and the government may seek actual and punitive damages for that person as well as any permanent or temporary injunction, temporary restraining order, or other order. 42 U.S.C. §§ 3612(*o* )(3), 3613(c)(1). In short, in this case—as the government notes, and defendants do not appear to dispute—"the government's interests in large measure coincide with those of aggrieved parties...." *See* OLC Memorandum (Jan. 20, 1995) (http://www.usdoj.gov/olc/civrts2mem.htm).

However—as defendants correctly point out, and the government concedes—the aggrieved persons on whose behalf the United States sues in this case are neither clients represented by counsel nor parties to this litigation. Thus, their communications with counsel for the United States do not precisely fit the mold of the common interest rule as it is ordinarily formulated—for example, by the Restatement (Third) of the Law Governing Lawyers:

> If two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged ... that relates to the matter is privileged as against third persons.

REST 3d LGOVL § 76. Nevertheless, two federal district courts have applied the common interest doctrine in the Fair Housing Act context, despite the fact that the aggrieved persons neither were represented by counsel nor were parties to the lawsuits in question.[2] In *United States v. Prestonwood Properties, Inc.*, the court granted a motion for protective order barring inquiry into communications between counsel for the United States and aggrieved persons, finding "that there is a common interest in litigation privilege that protects communications between counsel for the United States and the HUD complainants and other alleged aggrieved persons in matters such as this where the United States acts in its capacity to protect the interests of HUD complainants and the aggrieved persons to vindicate alleged violations of the Fair Housing Act." *United States v. Prestonwood Properties, Inc.*, No. 3:19–CV–495, Order Granting Motion for Protective Order at 2 (N.D.Tex. Sept. 15, 1999). Similarly, in circumstances comparable to those found in the instant case, the court in *United States v. Webb* denied defendants' motion to compel deposition testimony concerning conversations between aggrieved persons and government attorneys. *United States v. Webb*, No. 4:00–CV–698, Order denying Motion to Compel at 2–3 (E.D.Ark. Aug. 1, 2000). The court recognized

**2.** The relevant orders are attached in Exhibit B to the United States' response (Doc. # 226).

a privilege which protects communications between a governmental agency and persons on whose behalf the governmental agency brings suit. Although there is no technical attorney-client relationship between [the aggrieved persons] and the Government in this case, counsel for the Government is pursuing this case to enforce the rights of [the aggrieved persons] under the Fair Housing Act. Congress set up the Act to encourage and enable persons, who have been victims of discrimination, to pursue justice when those victimized persons do not have the financial resources to litigate such a claim. It does not follow that persons who choose to utilize this Act give up their right to confidential communications with the attorney representing their interests.

*Id.* at 2–3.

Further, in a related context, courts have found that a common interest exists between Equal Employment Opportunity Commission (EEOC) attorneys and aggrieved individuals in several cases. *See E.E.O.C. v. HBE Corp.,* 1994 WL 376273, 2 (E.D.Mo.1994) ("A number of courts have held that when the EEOC brings suit on behalf of individuals, the communications between the attorneys for the EEOC and the charging party are protected by the attorney-client privilege.... Both the EEOC and Ey have sued defendant HBE for alleged discrimination against Ey and, as such, the Court finds that they have common interests in this litigation to vindicate the alleged violations of Ey's rights."); *Bauman v. Jacobs Suchard, Inc.,* 136 F.R.D. 460, 462 (N.D.Ill.1990) ("In this case, however, the EEOC and the other plaintiffs, including Kaspar, are aligned together. The privilege applies to communications between a party and the attorney for a co-litigant."); *E.E.O.C. v. Chemtech Intern. Corp.,* 1995 WL 608333, 1 (S.D.Tex.1995) ("[T]he attorney-client privilege may apply in the governmental context between a government attorney and a pri-

vate citizen.... In addition, because the EEOC and the private citizen have many identical interests, the attorney-client privilege is essentially a joint prosecution privilege that extends to communications between a party and the attorney for a co-litigant."). In addition, in other courts have extended the common interest rule beyond parties and clients alone, to non-parties in current litigation and even "potential co-parties to prospective litigation." [3] *In re Grand Jury Subpoenas, 89–3 and 89–4, John Doe 89–129,* 902 F.2d 244, 249 (4th Cir.1990) (citation omitted) (communications between parent and subsidiary companies concerning prosecution of joint claim against the government were privileged from disclosure under the common interest rule even though subsidiary was not a party to the litigation, where subsidiary was the real party in interest and recovery would inure to it); *see also Anderson v. Torrington Company,* 120 F.R.D. 82, 86 (N.D.Ind.1987) (communications between non-party union and plaintiffs' attorney in ADEA action were privileged from disclosure where union had common interest with plaintiffs, as plaintiffs were union members and union had played active role in litigation); *In re LTV Securities Litigation,* 89 F.R.D. 595, 604 (N.D.Tex.1981) ("We agree with Defendants that disclosure of privileged information by an attorney to actual or potential co-defendants, or to their counsel, in the course of a joint defense does not constitute a waiver of the attorney-client privilege."); and *Matter of Grand Jury Subpoena Duces Tecum Dated November 16, 1974,* 406 F.Supp. 381, 389 (D.C.N.Y.1975) ("I conclude that the attorney-client privilege covers communications to a prospective or actual co-defendant's attorney when those communications are engendered solely in the interests of a joint defense effort.").

■ Accordingly, this court will follow the Northern District of Texas and the Eastern District of Arkansas in recognizing that the

---

**3.** The aggrieved persons in this case are potential co-parties in the sense that they have a statutory right to intervene in this action. 42 U.S.C. § 3612(c) ("Any aggrieved person may intervene as a party in the proceeding."). If they exercised that right, the common interest privilege would apply without question to their communications with government counsel unless the interests of the two parties diverged substantially. The court declines to construe the common interest doctrine to require aggrieved persons to forgo suit by the Attorney General on their behalf in order to secure the protection of that doctrine.

common interest rule protects communications between a governmental agency and persons on whose behalf the governmental agency brings suit, where counsel for the government has filed suit to enforce the rights of aggrieved persons under the Fair Housing Act. This approach is consistent with the long-standing purpose of the attorney-client privilege, which "is intended to encourage 'full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *Almeida*, 341 F.3d at 1324 (citation omitted). "[T]he privilege is grounded 'in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.'" *Id.* (citation omitted). The basic principles underlying the attorney-client privilege are no less relevant in the instant action. Where Congress has authorized enforcement of a statute through government suits raising individual claims, and the purpose of the United States' lawsuit is to obtain relief on an individual's behalf, that person should have the same opportunity to engage in confidential communications with the attorney litigating on his or her behalf as with a retained private attorney, so long as the aggrieved person and the United States retain interests in common.

Of course, to qualify for the protection of the common interest rule, the communications at issue must have been made in confidence. *See United States v. Schwimmer*, 892 F.2d 237, 244 (2nd Cir.1989); *United States v. Bay State Ambulance and Hosp. Rental Service, Inc.*, 874 F.2d 20, 28 (1st Cir.1989); *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir.1985). Here, the United States represents, and defendants do not dispute, that lawyers for the government met with the complainants at their homes during the "victim location" process, with only the assistant U.S. attorney, his or her paralegal, and the aggrieved person present. The complainants were told at that time that the United States asserted the common interest privilege, instructed that their communications would be kept confidential, and asked not to disclose those communications other than with representatives of the United States. Under these circumstances, the court concludes that the aggrieved parties would have reasonably understood the communications at issue to be confidential.[4] Accordingly, the United States' cross-motion for protective order (Doc. #226) is due to be granted to the extent that defendants may not inquire into the United States' communications with aggrieved persons in this lawsuit, and defendants' motion for determination as to privilege (Doc. #220), which the court construes as a motion to compel, will be denied.

With regard to the United States' related request for a protective order "to prevent the repetition of a pattern of unprofessional behavior engaged in by Defendant's counsel during future depositions" (Doc. #226 at 11), the court declines at this stage to enter such an order, finding both sides (although not all counsel) in this litigation to blame for the generally acrimonious and unpleasant nature of the proceedings thus far in this case. To the extent that defendants' counsel have engaged in any of the behavior complained of by the United States—mocking witnesses, making inappropriate speaking objections, distracting witnesses during testimony, yelling, and insulting counsel—they are clearly in the wrong, and the court will not tolerate unprofessional conduct of this kind. On the other hand, government counsel have much to learn about working amicably within the culture of local counsel, and their sometimes overly aggressive and punctilious efforts to police the other side have resulted in a great deal of unnecessary frustration and ill will. The court expects future depositions to proceed with a professional manner and courteous tone, without pettiness, bickering or squabbling. Counsel not prepared to abide by the court's expectation of courtesy and collegiality should look forward to a full-blown evidentiary hearing concerning any al-

---

4. In one instance addressed in defendant's motion, assistant U.S. Attorneys asserted the privilege as to communications with aggrieved persons during a break from a deposition. At the hearing on the motion, defendants indicated that this matter is moot.

leged future infractions and the imposition of substantial monetary sanctions where warranted.

The second discovery dispute before the court relates to defendant Jamarlo Gumbaytay's motion to compel compliance with subpoena (Doc. # 231), and the motion to quash subpoena (Doc. # 232) filed by third party Central Alabama Fair Housing Center (CAFHC). The court held a hearing on this matter on December 17, 2010.

Gumbaytay's subpoena duces tecum, dated October 13, 2010, seeks production from CAFHC of "[t]he complete files or writings of any description, including but not limited to all letters, notes, complaints, memoranda, e-mails or telephone records to, from or in any way concerning" some 29 individuals listed in the subpoena. CAFHC's brief in opposition to motion to compel indicates that the Center has a number of documents responsive to Gumbaytay's subpoena, which fall into eight categories:

1. Notes made by John Pollock of telephone conversations with persons who called in response to CAFHC's form letter.

2. Declarations signed by various individuals.

3. Cover letter to HUD referring cases for administrative action.

4. Complaint filed by HUD.

5. Records of meetings and conversations with counsel from ACLU and Legal Services Corporation of Alabama.

6. Preliminary drafts of pleadings.

7. Documents subpoenaed from Montgomery Housing Authority.

8. Documents received from clients, including letters to and from one or more defendants, ren[t] receipts, transcripts of telephone conversations, and an audio tape containing evidence of sexual harassment.

CAFHC brief (Doc. # 248) at 1–2. During the motions hearing on December 17, 2010, counsel represented that the documents in categories 2, 3, 4, and 8 either previously have been or will be provided to defendant. In turn, Gumbaytay indicated that he does not seek production of categories 5,[5] 6, and 7.[6] Thus, the only category of documents remaining at issue—for which CAFHC asserts both the attorney-client and work product privileges—is "[n]otes made by John Pollock of telephone conversations with persons who called in response to CAFHC's form letter."

CAFHC's brief does not indicate specifically which persons listed in the subpoena actually responded to the form letter by engaging in telephone conversations with John Pollock for which he kept notes. Its motion to quash lists the following individuals as making some kind of contact with Pollock which resulted in "investigative notes": Aurpy Burt, Rotonia Edwards, Rita Julian, Valerie Manning, and Maggie Williams. In addition, according to the motion, Pollock's contact with Valisha Jones, Sheila Scroggins, Lois Webb, Tamekia Kemp, and Bennettia Morris yielded "attorney and paralegal notes," and CAFHC also has "documents and notes related to its initial interview" with Letisha Williams. CAFHC motion to quash (Doc. # 232) at 1–5. At the hearing, CAFHC confirmed that it has notes relating to conversations between Pollock and Burt, Edwards, Jones, Manning, Scroggins, Webb, Maggie Williams, Kemp, Morris, Letitia Williams and Julian.

CAFHC maintains that it had an attorney-client relationship with each of the women referenced above at the time that the notes were made. According to the motion to quash, CAFHC represented Burt, Edwards, Julian, Manning, Scroggins, and Williams in HUD administrative proceedings, CAFHC motion to quash (Doc. # 232) at 1–3, and CAFHC's supplemental response attaches copies of letters signed by Burt, Edwards, Julian, Manning, Scroggins, and Maggie Williams in March 2008 which informed HUD that each of these individuals "wish[ed]

---

5. At the hearing, counsel for defendant sought production of records of meetings and conversations among counsel for CAFHC, ACLU, and Legal Services Corporation of Alabama relating to any HUD proceedings. Subsequently, CAFHC notified the court that it had no such records.

Response to the Court's Verbal Order (Doc. # 252) at 1.

6. Counsel for the United States represented during the hearing that she had previously provided the documents in category 7 to Gumbaytay.

to have the Central Alabama Fair Housing Center represent [them] in [their] complaint[s] against Jamarlo Gumbaytay and James Clark." CAFHC's supplemental response to the court's verbal order (Doc. # 253). In addition, CAFHC represents that it provided "legal advice" to Jones, Kemp, Morris, and Letisha Williams, and provided "legal counsel" to Webb. CAFHC motion to quash (Doc. # 232) at 1–5.

██ As noted above, federal privilege law governs the application of the attorney-client privilege because the court has federal question jurisdiction over the subject matter in the instant case. *Hope For Families & Community Service*, 2009 WL 1066525 at 4. "The attorney-client privilege applies to 'confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice.'" *Miccosukee Tribe of Indians of Florida v. United States*, 516 F.3d 1235, 1262 (11th Cir.2008) (citation omitted). "The Supreme Court has broadly construed this privilege in support of the underlying policy 'that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.'" *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). "'The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential.'" *Bogle v. McClure*, 332 F.3d 1347, 1358 (11th Cir. 2003) (citation omitted). "'To determine if a particular communication is confidential and protected by the attorney-client privilege, the privilege holder must prove the communication was "(1) intended to remain confidential *and* (2) under the circumstances was *reasonably* expected and understood to be confidential."'" *Id.* (citation omitted.)

██ In the instant case, CAFHC seeks protection from discovery of notes made by a paralegal, John Pollock,[7] of telephone conversations[8] with persons who called in response to "CAFHC's form letter." This letter—a copy of which is attached as Exhibit B to Doc. # 242—was written on behalf of the CAFHC, the American Civil Liberties Union, and Legal Services of Alabama, and addressed to female tenants living in rental units managed by defendant. The letter indicated that the CAFHC, the American Civil Liberties Union, and Legal Services of Alabama were currently working with three tenants in Montgomery "who report[ed] that they were sexually harassed" by defendant during the course of their tenancies, and stated that these entities had "already filed a Fair Housing Act lawsuit" on behalf of one of the tenants in Federal District Court. The letter explained that "sexual harassment can be in the form of verbal pressure to have sexual relations or requests for sexual relations in exchange for other favors," and concluded as follows:

> If you or others you know have had or are having this problem with Mr. Gumbaytay and would like to contact us, we will not disclose any of the information you provide us to anyone unless ordered by a court. You should know that the federal Fair Housing Act protects those who complain against acts of retaliation, such as a tenant's lease being terminated because of the fact that she reported sexual harassment. **If you would like to speak with us, please call (334) 263–4463 and ask for John.** If you do not reach us, please leave a number where you can be reached and an estimate of the best time to reach you.

Doc. # 242 (Exhibit B).

Defendant contends that, because Pollock is a paralegal and "[a] paralegal does not give legal advice," the attorney-client privilege cannot apply to communications made by tenants to him in response to the letter. Doc. # 242 at 5. The court cannot agree, for two reasons. First, as noted above, although Pollock is not licensed to practice as a lawyer

---

7. According to counsel at the December 17 hearing, Pollock is an attorney licensed to practice in two other states, but not in the state of Alabama.

8. At the hearing, attorney Cooper appeared to indicate that some or all of the women also came personally to the CAFHC office for further discussion. However, she did not indicate, and CAFHC's listing of responsive discovery in its brief does not suggest, that Pollock made notes of such discussions.

in Alabama, he *is* licensed to practice in two other states. According to a leading privilege treatise,

> it is not necessary that the attorney be admitted to practice in the jurisdiction where the services are rendered, the communications are made, or the court determining the privilege claim sits. As long as the attorney is permitted by law to render legal advice, the privilege will attach regardless of where the communications are made.

Epstein, Edna S., *The Attorney–Client Privilege and the Work Product Doctrine,* 136 (4th ed. 2001); *see also Boca Investerings Partnership v. United States,* 1998 WL 426564, 5 n. 4 (D.D.C.1998) ("I know of no principle that would have the existence of the privilege to turn on bar membership in the state where the advice is rendered. It would be a harsh and illogical rule to require a client to demand proof of bar membership before confiding in her attorney and deny the privilege if the client fails to do so. The privilege should fairly turn on the client's reasonable perception of whether she is dealing with a person who appears to be authorized to provide legal advice, not on the arcane question of bar membership in the state where the advice is rendered."). Second, even if Pollock were not a lawyer, "[i]n general, agents and subordinates working under the direct supervision and control of the attorney are included within the scope of the attorney-client privilege." Epstein, *The Attorney–Client Privilege and the Work Product Doctrine* at 147; *see also von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 146 (2nd Cir.1987) (" '[T]he privilege must include all the persons who act as the attorney's agents.' ") (citations omitted); *In re Grand Jury Proceedings,* 786 F.2d 3, 6 n. 4 (1st Cir.1986) (Assuming that a paralegal or an otherwise authorized agent of a qualified attorney can assert a claim of privilege and citing cases.). In the instant case, Pollock acted under the direction of a CAFHC lawyer, Faith Cooper, in connection with calls from potential clients in response to the letter. Accordingly, the fact that he is employed as a paralegal does not vitiate the privilege.

Defendant also contends that the calls were not made for the purpose of seeking legal advice. However, given the nature of the letter to which the calls responded, it is clear that the contacts were not, for example, simply social or business calls. The callers contacted CAFHC to explore the possibility of raising potential Fair Housing Act claims, whether or not they were fully knowledgeable about such claims or the particulars of the Act, and whether or not they ultimately agreed to be represented. Preliminary consultations of this kind are protected by the attorney-client privilege. *See, e.g., United States v. Bennett,* 2010 WL 4313905, 4 (S.D.Ga.2010)("This conversation has all of the hallmarks of the typical initial meeting between a lawyer and a potential client. Such conversations—preliminary to entering into a formal representation agreement—are clearly protected by the attorney-client privilege.") (citing *Westinghouse Elec. Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311, 1319 (7th Cir.1978) ("The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result."); 1 McCormick on Evidence § 88 ("[c]ommunications in the course of preliminary discussion with a view to employing the lawyer are privileged though the employment is in the upshot not accepted"); Restatement (Third) of the Law Governing Lawyers §§ 14 & 15."). In addition, some of the preliminary conversations did result in more formal arrangements for further representation on behalf of Burt, Edwards, Julian, Manning, Scroggins, and Maggie Williams, as evidenced by their letters to HUD.

Thus, CAFHC has succeeded in establishing the existence of an attorney-client relationship between the callers and John Pollock as an attorney and/or the agent of an attorney. The court further finds—based on CAFHC's representation in the letter that it would "not disclose any of the information you provide us to anyone unless ordered by a court"—that the callers' communications were intended to remain confidential and reasonably expected and understood to be confidential. Accordingly, the notes recording those conversations are privileged.

Defendant contends, however, that even if an attorney-client relationship existed, "any privilege was waived by the communication of alleged confidential communications by CAFHC to HUD and the U.S. Justice Department." Doc. # 242 at 5. In this regard, defendant does not appear to claim that Pollock's actual notes from his phone conversations were sent to federal authorities. Instead, he states that "John Pollock gathered information, put it in the required format and forwarded his information to HUD and to the Justice Department." Doc. # 242 at 6–7; *see also id.* at 5 ("Pollock filled out forms and sent them to HUD and the Justice Department."). Defendant argues that Pollock's disclosure of information to federal agencies, which was gained from his interviews with callers, had the effect of waiving the attorney-client privilege as to any undisclosed communications from the callers concerning the same subject matter pursuant to Fed.R.Evid. 502.

Again, the court cannot agree. Nothing before it suggests that Pollock forwarded the notes themselves to either federal agency, so his communications with the callers were never directly disclosed. Instead, Pollock apparently sent forms—specifically, according to counsel's representation at the hearing, administrative complaints—to HUD on behalf of some of the callers which contained alleged facts reported to him during the calls. No privilege is claimed as to these forms or the facts reported in them; the only privilege asserted relates to Pollock's notes recording the underlying communications. The court cannot conclude that Pollock's use of these notes to assist him in filling out agency forms waives the privilege as to the notes.[9] *Cf. Hudson v. General Dynamics Corp.,* 186 F.R.D. 271, 276 (D.Conn.1999) ("Since information obtained from a client by means of an interview is commonly used by attorneys to prepare litigation documents which clients must then verify under oath, the Court concludes that a finding that the plaintiffs have waived their privilege merely by the fact that their questionnaire responses were used to draft the plaintiffs' affidavits opens too wide a door on this important privilege.... [T]he fact that their responses were used by their attorney to assist in drafting their affidavits which they then individually signed under oath is not alone a use that should waive the attorney client privilege, just as notes taken by counsel from a client's oral account would not be discoverable simply because they were used to assist counsel in drafting an affidavit thereafter."). To put this point another way, disclosure of facts contained in a communication does not open the door to discovery of the communication itself. *See Carpenter v. Mohawk Industries, Inc.,* 2007 WL 5971741, 10 n. 9 (N.D.Ga.2007) ("A waiver of the attorney-client privilege ... may occur when a party discloses otherwise privileged communications, or testifies as to those communications.... Simply testifying about facts, however, will not waive the attorney-client privilege.") (citations omitted).[10] Thus, the attorney-client privilege has not been waived, and Pollock's notes are not due to be turned over in discovery to defendant.[11]

For the foregoing reasons, it is

ORDERED as follows:

1. Defendants' motion for determination as to privilege (Doc. # 220), which the court construes as a motion to compel, is DENIED to the extent that the motion seeks to compel testimony concerning privileged matters and requests a "protective order to preclude future violation of the Court's Guidelines to Civil Discovery Practice." The motion is

9. Such a ruling would, by extension, strip all client communications used to draft an administrative or court complaint of their privileged status as soon as that complaint was filed.

10. Fed.R.Evid. 502 does not compel a different result. That rule provides, in relevant part, that when a disclosure is made to a Federal agency "and waives the attorney-client privilege ..., the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." Fed.R.Evid. 502(a). Here, no waiver of the privilege has occurred.

11. Because the notes are protected by the attorney-client privilege, the court does not reach the question of whether the common interest rule applies or whether the work product doctrine offers an additional source of privilege.

GRANTED insofar as it moves for a determination as to privilege.

2. The United States' cross-motion for protective order (Doc. # 226) is GRANTED to the extent that defendants may not inquire into the United States' communications with aggrieved persons in this lawsuit. In all other respects, the motion is DENIED.

3. Defendants' motion to amend their motion for determination as to privilege (Doc. # 222) is GRANTED.

4. Plaintiff's motion to seal (Doc. # 227) is GRANTED.

5. Defendant's motion to compel compliance with subpoena (Doc. # 231) is DENIED.

6. The motion to quash subpoena (Doc. # 232) filed by third party Central Alabama Fair Housing Center (CAFHC) is GRANTED.

7. The court's stay of further depositions in this case is hereby LIFTED.